## THE F. C. LOCKHART.

## THE NOSTRA SIGNORA DEL BORCHETTO.

## THE RELIANCE.

(District Court, S. D. New York. December 11, 1919.)

**1. Collision ⬥71(1)—Bark dragging her anchor held in fault for collisions.**

A bark, which dragged her anchors during a heavy wind and came into collision with an anchored schooner and caused both to drift against a coal barge, *held* solely in fault for all damage done: (1) For having a defective anchor chain which broke, leaving but one anchor to hold her; (2) in not paying out sufficient length of chain upon either anchor to give maximum resistance to dragging; (3) in not earlier accepting the offered assistance of a tug; and (4) in paying out her anchor chain and casting off the hawser from the tug when finally employed leaving her subject to the full force of the tide which drove her against the schooner.

**2. Collision ⬥71(1)—Tug employed to assist bark which was dragging her anchor held not chargeable with fault.**

A tug employed to assist a bark which was dragging her anchor *held* not chargeable with fault in rendering the service which rendered her liable for collision between the bark and other vessels.

In Admiralty.. Suits by Albert Lawrence, master of the British schooner F. C. Lockhart, and by the Neptune Line, Incorporated, against the Italian bark Nostra Signora del Borchetto. Petition of the Newtown Creek Towing Company, owner of the steam tug Reliance, for limitation of liability. Decree against the bark for all damages.

Decrees affirmed 298 Fed. 173.

Harrington, Bigham & Englar, of New York City, for Lawrence.

Haight, Sandford & Smith, of New York City, for Piaggio.

Alexander & Ash, of New York City, for Newtown Creek Towing Co.

Foley & Martin, of New York City, for Neptune Line, Inc.

AUGUSTUS N. HAND, District Judge. [1] On February 26, 1918, the schooner F. C. Lockhart, and the Italian bark Nostra Signora del Borchetto, were anchored on what is known as Red Hook Flats, off Sixty-Ninth street, South Brooklyn. At about 5 a. m. on that day a severe squall came up and the bark dragged her anchor, until later in the morning she collided with the Lockhart.

I think the testimony shows with reasonable clearness that the bark was guilty of two faults: (1) Not paying out sufficient chain, of which there was an abundance still in her lockers; and (2) of having a weak or defective starboard anchor chain.

This starboard anchor chain had been inspected and passed by the Bureau Veritas, but that was in December, 1916, and the testimony of Capt. Proctor, who examined the broken chain in court, was not contradicted by any expert. He estimated that 15 per cent. of the chain had gone by wear and rust and condemned it as insufficient to hold in severe weather. This chain had apparently been subjected some months before to a severe strain in a storm in the Harbor of Buenos Ayres, and, I think, it was an insufficient reliance for severe

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

weather. It was suggested at one time in the argument that it was impossible to determine when the chain broke. The heaviest wind, however, was during the morning of the 26th, and it is quite apparent from the testimony of the second mate Recagno that he attributed the drifting, at least in part, to the breaking of the chain. He said, at page 78 of his deposition:

"Q. What made you drift? A. The strong wind and the breaking of the chain.

"Q. Which chain? A. The starboard chain.

"Q. Is that the part of the starboard chain that was on your vessel (indicating chain)? A. Yes.

"Q. That is the end of the chain that remained on board? A. Yes."

I understood it to be admitted upon the argument that neither the schooner nor the bark could obtain assistance of tugs on the 26th because there were none in the vicinity and the weather was too rough to permit a small boat to go ashore to secure assistance.

In the evening of the 26th, the vessels apparently came in contact again, but thereafter drifted apart. On the morning of the 27th the weather was calm, and the second mate Recagno went ashore to call the captain. He testified that no tugs had appeared in the meanwhile, and that at that time the vessels were clear.

Capt. Smith, of the tug Reliance, who seemed to be a trustworthy witness, said that he noticed the bark and schooner in contact on the morning of February 27th. This was after the second mate had gone ashore, and when the bow of the schooner was against the port side of the bark near the stern. He testified that he told the mate of the bark that he would tow her away from the schooner for $50, and that the mate said the second mate had gone ashore to obtain assistance and that they did not need the Reliance. Up to this time the schooner had been riding on her anchor which had not dragged, but later, as the tide began to ebb, the mate of the bark was advised by the master of the schooner to run up signals of distress and the tug Reliance returned. There is at this point a dispute. The master of the Reliance says that he agreed to use his best efforts to tow her away for $75, but said she must assume all risk. The master of the Lockhart, as well as the mate of the bark, said that the Reliance absolutely agreed to tow the bark clear and that the payment of $75 was to be conditional upon her effecting that result.

I think it somewhat improbable that when this tug had been refused employment once and her assistance was later sought by the bark in distress her compensation was conditional upon the result. I also think that what may have been warnings by the master of the Reliance that he might not succeed and that there was some risk involved are to be taken as a guaranty by the bark to hold him harmless. But it is not important, in view of my findings as to the conduct of the Reliance, which of the two stories is correct. The duty of the master of the Reliance was to act with ordinary care and skill under all the circumstances. He testified that the bark was lying at such an angle that the tide was not coming broadside but forward at only a slight angle. He therefore thought that he might be able to pull her away from the Lockhart by attaching a hawser to her bow. It is to

be noticed that the master of the schooner said, at page 26 of his deposition:

"Q. You think that was the best position to move the Nostra, from the bow? A. At that time I thought so myself, because the tide you see, tide running, thought it would be easier than to pull her hard against that tide, and I didn't think he could do it."

Under these circumstances, the hawser was attached and the tug began to pull, apparently without avail. The master of the tug says that suddenly the bark's anchor chain was paid out. This testimony is corroborated by the witness Evernham, of an oil tank steamer, and by the master of the Lockhart. It is admitted also by the mate Recagno, of the bark, but he says it was done by the order of the master of the tug: "He told me to heave the chain."

The necessary result of this paying out of the chain was to bring the starboard side of the bark more and more broadside of the ebb tide. The captain of the tug says that under these circumstances he told the officers of the bark to slacken the hawser so that he could steer the tug into a better position to tow, whereupon they cast the hawser overboard. That the bark did this is admitted, but they say it was at the direction of the tug master. The officers of the bark were Italians who apparently understood English poorly; but, if they were attempting to deal with a difficult situation in a foreign harbor and mistook instructions, the fault, I think, must be laid to them. I cannot understand what could have occasioned the paying out of the anchor chain and the casting off of the hawser. That both things happened is undoubted, and I think, under the circumstances, they are more likely to be attributed to misunderstandings on the part of the crew of the bark, who knew little English, than to instructions to do such inherently foolish things from the master of the tug.

The question remains whether it was bad seamanship for the master of the tug to attempt to tow away the bark by a line attached to her bow, rather than to her starboard side, near the stern. If, as the captain of the Reliance testified, the ebb tide was not running strong against the starboard side of the bark when the Reliance attempted to tow her by a line attached to her bow, I cannot see that the maneuver was a negligent one. I am inclined to think that it did not involve bad seamanship. It not only represented the best judgment of the master of the tug, but also of Capt. Lawrence, master of the schooner, who, as I have said above, testified that a hawser attached to the starboard bow of the Nostra was in the best position to move her. This opinion of two experienced seamen exercising their judgment on the spot should have greater weight than the theories of the expert, Capt. Proctor, based upon hypothetical questions. But it is urged that the tug should not have abandoned the bark when the hawser was cast off. Perhaps she did not show the most attentive consideration for the bark, but I am unable to see what she could have done at that time, or afterwards, to avoid the accident that occurred. When the anchor was cast off, the bark immediately drifted in the tide, which became a greater propelling force as it struck her more directly broadside. It is impossible to believe that in the brief time

which remained she could have picked up the hawser and given sufficient support to the bark to prevent her from dragging her anchor and drifting with the schooner into the coal barge Chapman. I think nothing in the evidence indicates that this would have been possible.

The bark was at fault in having a defective anchor chain so that she soon had to rely upon one anchor; in not paying out a sufficient length of anchor chain upon either anchor to cause the maximum resistance to dragging and safeguard her so far as possible; in not obtaining the assistance of the tug earlier in the day when there was scarcely any tide running, and finally in paying out her anchor chain and casting off the hawser from the tug so that she was immediately placed in a position where the full force of the ebb tide came against her. Under such circumstances, the court should not, I think, be astute to discover some fault of seamanship in the tug that went to her assistance when the faults of the bark were so conspicuous.

[2] The tug Reliance should be held free from fault; the schooner should recover her damages from the bark, and the barge should recover her damages also from the bark. I find no fault in the schooner for drifting against the barge. Her anchor, so far as the evidence shows, never moved until the strong tide carried the bark, whose helplessness was caused by her own fault, against the schooner, and dragged both vessels together against the barge. Costs should follow the award of damages. Settle decree on notice.

